S. PRESTLEY BLAKE and SETSU BLAKE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; S. PRESTLEY BLAKE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Blake v. Commissioner
Docket Nos. 8549-79, 8550-79.
United States Tax Court
T.C. Memo 1981-579; 1981 Tax Ct. Memo LEXIS 165; 42 T.C.M. (CCH) 1336; T.C.M. (RIA) 81579; October 1, 1981. Robert K. Gad, III, and Harry K. Mansfield, for the petitioners. Pamela V. Gibson and Daniel P. Ehrenreich, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined the following deficiencies and additions to tax with *167 respect to petitioners' income taxes: Addition to Tax,
Year
Deficiency
Sec.6653(a), I.R.C.1954
1973
$ 113,269
$ 5,663
1974
145,549
8,580
1975
319,369
15,968
1976
38,633
1,932
After concessions, the following questions remain: (1) whether petitioners may deduct the losses incurred by Mr. Blake's electing small business corporation in the operation of the yacht America, or whether such losses are nondeductible because they were incurred in an activity not engaged in for profit; (2) whether, in an effort to dispose of the America, there was a prearranged plan involving the "sale" of the yacht to an exempt organization which paid therefor with funds realized from the sale of greatly appreciated stock which Mr. Blake had meanwhile purported to donate to that organization for that purpose, and whether in the circumstances of this case there was thus in substance merely a charitable gift of the yacht and a sale of the appreciated stock on behalf of Mr. Blake; (3) whether, if both parts of the preceding question are answered in the affirmative, the Commissioner erred in his determination of the fair market value of the yacht at the time of its *168 transfer; and (4) whether any underpayment of tax was due to negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and related exhibits are incorporated herein by reference. [1]
At the time of the filing of their petitions herein, petitioners were residents of Somers, Connecticut, a suburb of Springfield, Massachusetts. Petitioners were husband and wife during 1973, 1974, and 1975; they filed joint returns for those years. The petitioners were divorced in 1976, and Mr. Blake is the only petitioner with respect to that year, although a joint return was also filed for that year. Mr. Blake will sometimes hereinafter be referred to as "petitioner". Petitioner is about 67 years of age. In the mid-thirties he and his brother started an ice cream business with $ 547 borrowed from their parents. The business consisted of *169 a small ice cream shop. A second store was opened five years later. With the coming of World War II both stores were closed, but they were reopened after the war, and thereafter more stores were added each year. In 10 years there were 50 stores, and ultimately the business included 625 stores or "restaurants" in the eastern, mid-Atlantic, and mid-western United States, together with two manufacturing plants. At some unspecified time the business was incorporated as the Friendly Ice Cream Corporation. Petitioner played the dominant role in the enterprise and was chairman of the board. He was substantially responsible for the financial success of the venture, and remained functionally in control of the enterprise, notwithstanding that the company had meanwhile "gone public" with more than half of the outstanding shares publicly held as a result of three successive public sales by the Blakes of a portion of their shares. The remaining shares, some 40 to 45 percent of the total number outstanding, were owned by petitioner and his brother together with members of their respective families. Shares of the corporation were publicly traded in the over the counter market. About three *170 years ago the entire business of Friendly Ice Cream Corporation was sold for $ 162,000,000. Petitioner retired at about that time. However, he had reduced his active participation in the affairs of that corporation to some extent in prior years. Petitioner had great business acumen, and throughout the tax years he was a man of considerable wealth. He was a person of standing in his community and had made a number of philanthropic gifts to nearby institutions. Among such gifts were $ 325,000 for a "Blake Student Center" at a local school and $ 275,000 for a "Herbert P. Blake Chair". Then, in conjunction with a person named Dewitt Wallace, he gave $ 85,000 to "seed" a new dormitory, designated "Wallace-Blake Hall". The record discloses some 10 additional gifts ranging from $ 22,000 to $ 500,000. Most of these gifts resulted in the naming of a facility for Mr. Blake, e.g., "Blake Athletic Field", "Blake Arena", and "S. Prestley Blake Law Center". Petitioner is an avid yachtsman. He began his salt-water yachting activities nearly 40 years ago. In that time he has owned four ocean-going vessels, and has sailed in many parts of the world. He is a member of several of the *171 world's most famous yacht clubs. In 1972 and for some years thereafter he owned a 47-foot ketch named the Ben-Bow. He ordinarily did not employ any full-time crews. He had never been in the business of operating boats for profit. In November 1972, Mr. Donald Parrot, president of John G. Alden, Inc., yachet brokers and naval architects, advised Mr. Blake that the yacht America was for sale. The America is a replica of the original yacht America built in 1851, after which the America's Cup is named. The replica (hereinafter referred to simply as the America) was built in 1967 for the F & M Schaefer Brewing Co. at a cost of $ 1,000,000. It was well known among yachtsmen. It had been used largely to promote the beer business of the Schaefer company. The America is a 105-foot long, gaff-rigged sailing schooner, with a diesel auxiliary engine. It is not suitable for racing against boats of modern design. Nor is it as suitable as other boats its size for chartering since it has only two staterooms, less than the usual number of at least three for a boat of that size.Nevertheless, these disadvantages are offset, at least in part, by the boat's mystique due *172 to its historical associations. Petitioner was definitely intrigued by the idea of acquiring the America. He and Mr. Parrot took the vessel on a trial sail, from Annapolis to New York in 24 to 36 hours, moving at times under sail and at times by power. The boat was generally manned by a captain, an engineer and five other crew members. In November 1972 petitioner delivered his $ 50,000 personal check for the seller as a deposit toward the purchase of the America. The purchase price was $ 500,000. However, the purchase was formally concluded, not by Mr. Blake as an individual, but by his wholly owned corporation, S.P. Blake, Inc., a Delaware corporation which was created for that purpose. It was formed on November 20, 1972.The corporation issued 100 shares of no-par common stock to Mr. Blake for $ 450,000. These funds, together with Mr. Blake's $ 50,000 down payment, were used to purchase the America. The $ 50,000 down payment was recorded on the books of the corporation as a loan by Mr. Blake. Shortly after its formation, the corporation duly filed an election to be treated as a subchapter S corporation. S.P. Blake, Inc., never had any property other than the *173 America or assets related thereto. The record does not show that the corporation was ever intended to, or in fact did, engage in any activities unrelated to the America. The corporation and the America were at all times relevant subject to the ultimate control of petitioner. During the negotiations for the purchase of the vessel Mr. Parrot and petitioner discussed the possibility of offering the America for charter. In a telephone conversation, Parrot supplied estimates of crew costs, repairs, supplies, insurance, and charter management expenses. Assuming that the America could be chartered for between 20 and 25 weeks a year at a fee of $ 6,500 per week, chartering the America would have produced a cash flow profit on the basis of Parrot's estimates, if normal depreciation were not taken into account. Petitioner had never been in the business of chartering a boat, nor did he consult other owners of charter boats or other sources to obtain estimates of operating expenses and to assess the possibility of profit from chartering prior to purchase of the America. Actual delivery of the America was made in January 1973, to the buyer's agent, Mr. *174 Donald Parrot. After the purchase of the America, S.P. Blake, Inc., on January 1, 1973, entered into a charter marketing agreement with Whittemore and Williams, Inc. ("Whittemore and Williams"), a yacht management and brokerage firm located in Greenwich, Conn. Whittemore and Williams is in the business of managing yachts held for charter purposes. Mr. Blake dealt primarily with Mr. William H. Whittemore of that firm. On February 15, 1973, S.P. Blake, Inc., entered into a management agreement with Whittemore and Williams. Under the latter agreement, Whittemore and Williams agreed to "use its best efforts to care for, operate, manage, maintain, supervise, and if requested, charter and/or sell" in America in consideration of receipt of an annual management fee. S.P. Blake, Inc., remained responsible for the expenses of operating, maintaining, and chartering the America, and was required to deposit funds for payment of those expenses with Whittemore and Williams. At least during the years 1973 and 1974 Whittemore and Williams maintained detailed accounts of the America's, expenses, set forth in records dated at approximately monthly intervals. Prior to taking *175 delivery of the America in January 1973, the following schedule was prepared, in consultation with Mr. Blake, for use of the boat from January 20, 1973, until shortly after May 7, 1973: AMERICA Schedule
Leave New York Jan. 20th - arrive Wilmington Del. Jan. 21st Leave Wilmington Jan. 21st - arrive St. Thomas approx. Feb. 3rd Cruise from St. Thomas Feb. 5th or 6th, returning Feb. 10th Feb. 11th - Mr./Mrs. Blake leave boat, Nao [Mr. Blake's stepson] remains aboard Feb. 10th-17th - AMERICA will be in or around St. Thomas Feb. 16th or 17th - Blakes return aboard Feb. 18th - cruise south toward Antigua, arriving by March 3rd Blakes leave AMERICA March 5th at Antigua Boat stays at Antigua March 3rd-10th Mr./Mrs. Blake and Ben & friend [Mr. Blake's son and his wife-to-be] arrive Antigua March 10th - English Harbour March 11th - cruise south to Guadeloupe (probably at harbor in sight of airport) arriving by March 16th March 17th - Ben and friend leave from Guadeloupe March 17th - Nancy and Basil [Mr. Blake's daughter and her husband] arrive Guadeloupe AMERICA leaves Guadeloupe March 18th, cruising to Antigua, arriving by March 24th Nancy and Basil *176 leave from Antigua March 24th or 25th - AMERICA stays in Antigua March 24th-30th Haru & Ed Reischauer [Mr. Blake's sister-in-law and brother-in-law] arrive March 29th March 30th or 31st - cruise north to St. Thomas, arriving by April 7th All leave April 8th AMERICA leaves April 9th or later for Miami, arriving April 24th or 25th Blakes arrive Miami April 26th for cruise to Nassau and return by May 2nd or 3rd Day sailing until May 7th, when all leave AMERICA leaves for north soon after May 7th For mail: Yacht AMERICA, c/o Robert Thompson, Yacht Haven Marina, St. Thomas, V.I. 00801 Yacht AMERICA, c/o V.E.B. Nicholson & Sons, English Harbour, Antigua, W.I. A comparable schedule was prepared for the next year (beginning in December 1973) as follows: SCHEDULE FOR AMERICA
Dec. 21 - Jan 1
St. Thomas to Antigua
Jan. 2 - 9
Antigua - Martinique
Jan. 9 - 21
At Martinique
Jan. 20 or 21 - 27
Martinique - Barbados
Jan. 27 - Feb. 3
Barbados - Grenada
Feb. 3 - 21
At Grenada
FIC DIRECTORS MEETING - FEBRUARY 14 Feb. 21 -28
Grenada to Trinidad
Feb. 28 - March 6
Trinidad to Venezuela & Trinidad
March 6 - 12
Trinidad to St. Vincent
March 12 - 18
St. Vincent to Martinique
March 18 - 29
At Martinique or go to Antigua alone
March 30 - April 14
Antigua to St. Thomas
April 15 - 22
At St. Thomas (get ready for crossing)
April 23 - 30
To Bermuda
(SPB to Bermuda May 12)
May 15
Lv. Bermuda for France
*177 TALL SHIPS Race - July (Underscored date means SPB aboard) In the course of managing the America, Mr. Whittemore wrote numerous letters to petitioner (as an individual and not identified as an officer of S.P. Blake, Inc.) beginning with the familiar saluation "Dear Pres." The first such letter in evidence, dated March 1, 1973, reports to petitioner about expenditure of funds "to put the yacht in shape for your arrival this weekend", and expresses the the "hope that you will finally have a chance to enjoy the AMERICA". In some of Mr. Whittemore's other letters there are a number of references either to petitioner's enjoyment of the vessel or to cruises or cruising by petitioner which suggest a definitely understood purpose that the vessel would be used for petitioner's pleasure. Mr. Whittemore was aware that Mr. Blake was interested for tax purposes in treating the operation of the America as a business or profit-oriented venture. In this connection he wrote to petitioner on November 2, 1973, as follows: I had a meeting with Don Dupre earlier this week in which we discussed the overall expenses to date as they would relate to your final tax shelter. I am enclosing *178 a copy of the figures to date.
As you know, to qualify for a sub-chapter "S" corporation, you must be able to show a genuine possibility of a profit. Normally, we would depreciate a yacht at 15% per year on the capital investment. We would also take all operating costs. With all the costs of improvement and the high value of the vessel, this would mean that you would have to realize 35-40 weeks of charter per year to break even. This number of charter weeks is not probable and would not create a genuine possibility of a profit. To establish a profit possibility, Don Dupre and I recommend that the yacht be depreciated at the slower rate of twenty years or 5% per year on capital items and that as many operating items be capitalized as possible. By adjusting these figures, we can show that there is a genuine possibility of making a profit with approximately 20-25 weeks of charter. Since you will probably be audited, we feel this is the safer road to take and advise accordingly. The potential chartering market for the America was limited primarily to persons interested in chartering the vessel because of its historic association and novelty.As a gaff-rigged vessel of *179 its type, it would not be chartered for racing purposes, and, although it had two staterooms for four and two persons, respectively, and a main salon, it did not have the number of staterooms that would normally be expected for such a large vessel. During the period of over two years in which S.P. Blake, Inc., owned the America, it was chartered to a party other than petitioner for only a single one-week period, during February 1974. This charter was for a fee of $ 5,500 plus expenses. Sparkman & Stevens, a brokerage firm, obtained the charter and received a commission of $ 845. Petitioner sometimes made payments to S.P. Blake, Inc., for his own use of the yacht. However, he did not make payments in respect of every use by him, and there was no clearly established policy, or explicitly articulated agreement between petitioner and his corporation, specifying when he would or would not be required to pay for any particular use of the vessel or even the amount or method of computing the amount of any such payment. With the exception of the foregoing one-week charter arranged by Sparkman & Stevens, all of the "income" reported by S.P. Blake, Inc., during 1973 and 1974 reflected *180 payments by petitioner. During the corporation's ownership of the America, petitioner made funds available to Whittemore and Williams periodically or otherwise as needed for crew salaries, current maintenance, repairs, and other expenditures relating to the America; only some of such payments or advances were treated as charter fees. There were no charters executed by the corporation and petitioner, and there were no fixed charter rates or other specific provisions setting forth the responsibilities and obligations of the corporation and petitioner with respect to the vessel. Whittemore and Williams made known the vessel's availability for charter in letters or flyers to travel agents and brokers which went out twice a month. Such communications merely listed the America as one of a number of yachts that were being offered for charter. Copies of such letters or flyers sent in August 1973, January 1974, and March 1974 are in the record and show the America's availability for charter at rates from $ 6,000 to $ 7,000 per week. Such rates were substantially higher than the rates quoted for most of the other smaller boats listed. Notwithstanding that the America was *181 thus listed as of early 1973, Whittemore and Williams was instructed not to accept charters until the summer of 1973. Although requests for or inquiries about chartering the America were received from time to time, the only charter was the one-week February 1974 charter. No brochure describing the America was prepared to assist in promoting charters, notwithstanding that it is customary to prepare such brochures for yachts offered for charter. During the course of S.P. Blake, Inc.'s ownership of the America, various difficulties arose in the operation of the vessel. Petitioner was dissatisfied with several of the America's captains. Repairs to the America were often necessary, and the vessel spent substantial periods of time in shipyards undergoing repairs and improvements. However, petitioner spent a significant amount of time personally using the vessel, in spite of these difficulties. Various members of petitioner's family and petitioner's friends were also aboard from time to time. The record does not establish that any of the foregoing repairs and improvements were anticipated at the time of acquisition of the vessel. In January of 1973, in accordance *182 with the first schedule set forth above, petitioner sailed from City Island, New York, to the Caribbean. During the course of that cruise the vessel encountered some unfortunate problems, and petitioner became completely dissatisfied with the America's then captain, Captain Thorpe. The trip as a whole was a very unhappy one for petitioner. The America arrived in St. Thomas on February 10, 1973, and petitioner left the vessel there while it underwent repairs to correct various defects and to do varnish work. As a consequence of petitioner's intense dissatisfaction on that first cruise on the America, he attempted to give the vessel to Mystic Seaport in Mystic, Conn. However, despite initial encouragement of the gift, the director of Mystic Seaport wrote petitioner on April 16, 1973, and informed him that the board of trustees had determined not to accept the gift because the Seaport's potential uses of the America would require funds beyond the financial capabilities of the institution. After the America's first cruise, petitioner replaced Captain Thorpe with A. C. deVilliers. Petitioner rejoined the America on February 17, 1973, and sailed from St. *183 Thomas to Antigua, leaving the vessel on March 3. Petitioner was again aboard the America from March 11 through April 9, stopping at Antigua, Martinique, and St. Thomas. From May 9 to 17, petitioner and the America sailed from St. Thomas to Fort Lauderdale, Florida. During the trips from February through May, petitioner was aboard the vessel for his personal pleasure. The America was built with alternating current powered by a diesel generator. Over the course of a year, the America underwent modifications to convert all electrical components on the boat to direct current. Thus, from May 17 to June 14, 1973, the America was in Fort Lauderdale for electrical work. On June 14, with the electrical work incomplete, the America left for Fairhaven, Mass. Work on the electrical system continued at Fairhaven from June 26 through October 29, and other normal repairs and maintenance also took place at Fairhaven. During this period, petitioner sailed the vessel for approximately 14 days on a trip up the Maine coast. The America left Fairhaven on October 29, 1973, and arrived in St. Thomas on November 18, 1973. On December 21, 1973, petitioner joined *184 the America in St. Thomas and it sailed to various places including St. John (V.I.), Antigua, Martinique, Virgin Gorda Sound, St. Barthelemy, Dominica, Barbados, Grenada, and Mustique Island. Petitioner left the vessel on January 29, 1974, and it was chartered from February 4 through 11, [2] 1974, to a person named Gubelman -- the charter previously mentioned and the only charter to someone other than petitioner during the entire period that the corporation owned the boat. From February 13, through March 5, 1974, the America sailed from Grenada to Trinidad, to Venezuela, and to Port Chaguaramas, Trinidad, with petitioner aboard. Petitioner was not aboard the America continuously from December 21, 1973, through March 5, 1974; he "made at least 3-6 round-trip flights to and from Connecticut and Islands during this period".
From March 5, 1974, through May 18, 1974, the America *185 was in the Swan Hunter Yard in Trinidad for repairs. Dry rot had been discovered in the two masts, and both had to be replaced. Moreover, following a trial run after the replacement of the masts, the 18-foot main bowsprit was broken in a collision with a dock when the America's engine failed to reverse. Thus, the bowsprit had to be replaced; no suitable wood could be located, and a steel boom was added instead.
Sometime prior to 1974, the America had been invited to participate in the "Tall Ships Race" in Europe, from Copenhagen, Denmark, to Gdynia, Poland. The race involved an assembly of training ships from different countries all over the world and began with various festivities in Copenhagen. Petitioner invited the editor of Yachting magazine to participate in the race and to write an article about the race and the America. Such an article was subsequently published in the September 1974 issue of Yachting magazine. Prior to the Tall Ships Race, the America sailed from Trinidad to St. Thomas after leaving the Swan Hunter Yard on May 18, 1974. Petitioner joined the vessel in St. Thomas June 8 and was aboard as it sailed to Copenhagen, with stops in the Azores *186 and England. The America arrived in Copenhagen on July 4. It won the Tall Ships Race. The square-rigged vessels against which the America raced hardly represented serious competition, and the America's victory did not add greatly to its prestige. It was merely a "plus" factor. The America then returned to Copenhagen, and set sail for Portsmouth, England, on July 27, 1974. On the way to Portsmouth, the weld at the end of the steel bowsprit gave way. Petitioner left the vessel on August 4. The America left Portsmouth on August 15 and sailed to Southampton, England, for repairs at the Camper & Nicholson yard. Petitioner found the "sloppiness" of Captain deVilliers intolerable, and discharged him. The new captain, John Guthrie, supervised the repairs. Camper & Nicholson replaced the broken steel bowsprit with a wooden bowsprit, and various repairs to the engine and other parts of the vessel were undertaken. The repairs were not completed until December 25, 1974. Following the completion of the repairs, the America sailed south to the Madeira Islands and the Azores. On January 13, 1975, petitioner joined the vessel in the Azores and it sailed to Dakar, *187 Senegal. In Dakar, a party was held for the Ambassador and visiting dignitaries. From there, the America sailed to Banjul, Gambia, and up the Gambia river, in response to an invitation from the President of Gambia. Petitioner invited a writer along for this trip; an article describing the trip was later published in the July 1975 edition of Yachting magazine. The America returned to Dakar for repair work at the French Naval Base, and petitioner left the vessel on February 4, 1975. After petitioner left the America in Dakar, he was aboard the vessel only from March 1 through March 6, 1975, for a cruise from Barbados to St. Thomas. In January and February 1975, petitioner and the Superintendent of the United States Merchant Marine Academy discussed whether the Academy would be interested in possessing and using the America as a training vessel. The response was that the Academy was interested. Petitioner had previously been approached by representatives of the Academy in May of 1974 soliciting a gift of the America. The Superintendent of the Academy wrote petitioner on February 27, 1975, expressing willingness to accept the vessel and petitioner's pledge *188 to donate $ 10,000 annually for her maintenance. However, acceptance was contingent on a survey of the America, and the Academy would not agree to hold the vessel for more than three taxable years in order to determine whether it could afford to maintain the vessel. Petitioner also received inquiries from other charitable organizations soliciting a gift of the America. John G. Alden, Inc., offered the vessel for sale. No purchasers were found, although one person previously unknown to petitioners indicated interest by telephone in purchasing the vessel for $ 675,000, but he failed to appear to inspect it and nothing further developed in that connection. Petitioner subsequently decided to make the America available to Kings Point Fund, Inc. (the "Fund"), a charitable corporation described in section 501(c)(3), I.R.C. 1954. It had been incorporated by the Alumni Association of the Merchant Marine Academy, and functioned for the benefit of the Academy. However, the transaction was structured in the form of a "sale" of the America to the Fund preceded by a "donation" of 35,000 shares of Friendly Ice Cream Corp. stock to the Fund with the expectation that the stock *189 would be sold and the proceeds would be used to pay for the America. It does not appear that the Fund would otherwise have undertaken to "purchase" the America or that it even had funds that could be used for that purpose apart from the cash made available to it by selling the Friendly Ice Cream Corp. stock. Nor would petitioner have otherwise made such a substantial "gift" of stock to the Fund in the absence of an understanding that the proceeds of its sale would be used to "purchase" the America, notwithstanding that the board of directors of the Fund may not have been legally bound to go through with the projected "purchase". Petitioner's dominant objective for these interrelated transactions was to dispose of the America; it was not to make a gift of stock to the Fund. In accordance with the foregoing plans, petitioner, on March 17, 1975, transferred 35,000 shares of the stock of Friendly Ice Cream Corp. to the Fund. The fair market value thereof was $ 686,875 at the time of the transfer, but they had an adjusted basis of only $ 98 in petitioner's hands. The Fund does not customarily retain gifts of stock, and the shares were promptly placed with Paine, Webber, *190 Jackson & Curtis, Inc., stockbrokers, for sale. In view of the size of the block of stock, it was prudent to offer only portions of it for sale at a time. The entire block appears to have thus been sold in a matter of at most a period of only several weeks. The sale ultimately netted the Fund $ 701,688.79. At the April 8, 1975, meeting of the directors of the Fund, the "donation" of the stock and its sale were reported. At that meeting, the directors unanimously approved a motion to "accept the generous donation of Mr. P. Blake to be used for the purchase of the Yacht AMERICA and her maintenance". Prior to this meeting, the directors had not formally authorized the purchase of the America. However, at the March 13 directors meeting, the board had authorized the yacht committee to take "such steps as necessary to acquire the * * * AMERICA subject to the consent of the Superintendent and legal counsel". It was anticipated by petitioner, and representatives of the Fund, that the directors' formal authorization of the purchase of the America would be forthcoming after the transfer of the stock, and the record does not contain credible evidence showing that petitioner *191 would have transferred the stock to the Fund without satisfactory assurance that the purchase of the America would follow the transfer of the stock. On April 14, 1975, William B. Mollard, president of the Fund, wrote petitioner and advised him of the sale of the stock and thanked him for his "generous gift in support of the United States Merchant Marine Academy". On April 22, 1975, Mr. Mollard again wrote petitioner and informed him that the directors had authorized Mr. Mollard to approve the acquisition of the America by purchase at a price of $ 685,000. The letter also thanked petitioner for his support of the Academy and for the opportunity to acquire the America. Petitioner subsequently received a check for $ 685,000 drawn on the account of the Fund and dated April 25. As indicated above, at the time he transferred the stock to the Fund, petitioner expected that the Fund would use the proceeds from the sale of the stock to purchase the America. He had discussed the Fund's purchase of the America with representatives of the Fund before he contributed the stock to the Fund. At the time he transferred the stock to the Fund, he was aware that the directors *192 of the Fund had not yet specifically authorized the acquisition of the America by way of a purchase rather than a donation, but he did not anticipate any difficulties with the approval of the purchase.He would not have given the Fund as large a contribution if he had not expected the Fund to use it to purchase the America, and he had reasonable confidence that the Fund would do so, notwithstanding that he knew that the Fund may not have been under a legal obligation to purchase the America with the proceeds from the sale of the stock. Petitioner had no need for the cash received from the Fund after its acquisition of the America; he put the money in a mutual fund and it remained there at the time of the trial of this case. If petitioner had not given the stock to the Fund, the Fund would not have had sufficient unrestricted resources to purchase the America. In fact, the Fund had less than $ 10,000 in unrestricted funds which could have been used for the purchase of the America. Following the acquisition of the America by the Fund on April 24, 1975, the directors discussed the disposition of the vessel at a meeting on June 17, 1975. At this meeting, *193 discussions with a possible purchaser were reported. The purchaser was reportedly willing to take the vessel on July 1, let the Academy use the vessel for the "Tall Ships Parade" in 1976, and pay a price which would "net the Fund over $ 200,000". Subsequently, the Fund transferred the America to Schooner America Corp. on August 6, 1975, for a stated price of $ 246,000. On March 18, 1977, the America was sold by its new owner to a person named Gilbert Hoard for $ 575,000 plus $ 50,000 contingent on chartering the vessel. Although the economic recession of 1974-1975 had an adverse effect upon the prices at which yachts could be sold, particularly with respect to vessels like the America (which had annual maintenance costs that could be expected to be around $ 100,0000), the $ 246,000 sales price on August 6, 1975, was substantially below its fair market value as of that time. A boat of that size was not readily salable, and in order to realize its full potential value it would have to be exposed to the market for a longer period of time than the relatively short period that elapsed between the time that the Fund decided to sell the America and the time that an agreement *194 was reached with the purchaser as to the sales price. For the taxable years 1973 and 1974, S.P. Blake, Inc., reported total losses of $ 144,708 and $ 201,595, respectively, and petitioners deducted these losses on their joint income tax returns for 1973 and 1974. In 1975, the corporation reported total income of $ 189,513. With the exception of an insurance refund of $ 1,291, all of the corporation's income was received as a result of the sale of the America. As a result of the sale, the corporation reported a long-term capital gain of $ 68,767, and an ordinary gain of $ 119,455, computed by taking into account the recapture of allowable depreciation under section 1245. After deducting operating expenses and depreciation, the corporation reported taxable income of $ 121,641. On their 1975 joint return, petitioners reported $ 68,767 of this income on Schedule D as their share of long-term gains from small business corporations and $ 52,874 on Schedule E as income from small business corporations. For 1976, the corporation reported a net loss of $ 1,940, and this loss was deducted on the joint return filed by petitioners in 1976. In the notices of deficiency issued with *195 respect to 1973, 1974, and 1976, the Commissioner disallowed the deductions of the losses from S.P. Blake, Inc., on the grounds that "the losses were not incurred in a trade or business, were not incurred in a transaction entered into for profit, or were not incurred for the purpose designated but rather the losses were attributable to transactions for * * * [petitioner's] personal benefit". The deficiency notice with respect to 1975 made no adjustments to the income reported by petitioner from his interest in S.P. Blake, Inc. On their 1975 joint income tax return, petitioners reported a contribution of 35,000 shares of Friendly Ice Cream Corp. stock to the Kings Point Fund at a value of $ 743,750. The fair market value of the shares on March 17, 1975, was $ 686,875; the figure used on the return was the result of a good faith error, the use of closing prices for the Friendly stock as reported in the March 17, 1975, edition of the Wall Street Journal, which contained the closing prices for March 16, 1975. After application of the 30 percent limitation of section 170(b)(1)(C), I.R.C. 1954, petitioners deducted $ 145,015 as a charitable contribution of capital gain property. *196 In 1976, petitioner claimed a carryover charitable contribution of capital gain property of $ 598,735, of which $ 163,268 was deducted after application of the 30 percent limitation. In the notices of deficiency the Commissioner disallowed these charitable contributions deductions on the basis that it had not been established that the contributions to Kings Point Fund had been paid during the taxable year or the contributions met the requirements of section 170, I.R.C. 1954. With respect to 1975, the Commissioner further determined that petitioner realized a long-term capital gain of $ 684,902 ($ 685,000 less $ 98 adjusted basis) on the sale of the Friendly Ice Cream Corp. stock by the Kings Point Fund. The net result of this adjustment was a $ 330,606 increase in petitioners' taxable income. Petitioners' returns for 1973, 1974, 1975, and 1976 were prepared by Main, Lafrentz & Co., in Springfield, Mass. Petitioner retained professionals with expertise regarding yachts and yacht chartering and accountants and legal advisors to assist in determining the proper reporting of both the acquisition of the America and the proper reporting of income and expenses from its operations. *197 In the notices of deficiency for 1973, 1974, 1975, and 1976, the Commissioner determined that a portion of the underpayment of tax was due to negligence or intentional disregard of rules and regulations, and accordingly proposed to assess the five percent addition to tax provided by section 6653(a), I.R.C. 1954. OPINION 1. Operating losses of the America. Section 1374(b) permits shareholders of electing small business corporations to deduct their portion of the corporation's net operating loss. Although a net operating loss is defined in section 172(c) as the excess of allowable deductions, including ordinary and necessary business expenses deductible under section 162, over gross income, section 183 limits the deductions of electing small business corporations with respect to activities "not engaged in for profit". Accordingly, we must determine whether the corporation's operations were undertaken with a bona fide expectation of realizing a profit.A reasonable expectation of profit is not required, but the facts must establish that the activity was in fact commenced and continued with a view toward realization of a profit.Section 1.183-2(a), Income Tax Regs.; see *198 Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F. 2d 170 (9th Cir. 1981); Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F. 2d 252 (2nd Cir.), cert. denied 389 U.S. 931 (1967). The determination of the corporation's primary motivation in undertaking the activity is a question of fact. See Carter v. Commissioner, 645 F. 2d 784, 786 (9th Cir. 1981); Dunn v. Commissioner, 70 T.C. 715, 721 (1978), affd. as to another issue 615 F. 2d 578 (2nd Cir. 1980). In making this determination, objective factors, such as those enumerated in the regulations, [3] are given appropriate weight, and petitioner's mere statements of his intent as the president of S.P. Blake, Inc., are not dispositive of the issue. Section 1.183-2(a), Income Tax Regs.; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). The ultimate question still remains, however, whether, considering all the evidence, the required profit motive or objective did in fact exist. *199 Based on our evaluation of the record as a whole, we conclude that S.P. Blake, Inc., did not undertake the ownership and operation of the America with a bona fide expectation of making a profit. Accordingly, petitioners are not entitled to deduct the net operating losses incurred by the corporation. While it is true that petitioner engaged Whittemore and Williams to manage the boat, that letters or flyers were sent out to brokers listing the America as available for charter, and that apparently fairly careful records were kept with respect to the finances of the vessel -- all supportive of a business-like profit oriented venture --, the weight of other more persuasive evidence tips the scales against petitioner. Mr. Blake is an extraordinarily astute businessman, and the evidence reveals that he is a person who gives great attention to detail. It was his acumen and leadership that was primarily responsible for transforming a tiny $ 547 ice cream business into an extensive corporate enterprise that was later sold for $ 162,000,000. It puts too much strain on our credulity to believe that he really expected the America to be a profitable venture based on the representations *200 made to him by Mr. Parrot, the salesman who was attempting to induce him to buy the vessel. Those representations assumed that the boat would be chartered between 20 and 25 weeks a year at a fee of $ 6,500 a week. However, no allowance appears to have been made for depreciation in Mr. Parrot's computations and we simply do not believe that a man of Mr. Blake's business experience was unaware of the necessity of taking depreciation into account in determining the profitability of a venture. We reject as incredible his lame explanation to the effect that he considered depreciation irrelevant because he expected the boat to increase in value. We heard him so testify, but we do not believe that such was in fact his state of mind. [4] Moreover, Mr. Blake made no independent investigation about the profitability of chartering the America. We find it difficult to conclude that a person of Mr. Blake's business experience would invest $ 500,000 cash in a risky venture that promised at most only a relatively modest cash flow return and no real profit, all on the representations of a salesman without further investigation. *201 All of the foregoing must be viewed against the background of Mr. Blake's many years of activity as an avid yachtsman who had owned ocean-going vessels and sailed in many parts of the world. Although he already owned a 47-foot ketch, the Ben-Bow, the opportunity to acquire the America was without doubt very tempting to a person of his wealth and love for sailing. He plainly looked forward to owning the America and the pleasure that could be anticipated in sailing it.
A more accurate gauge of Mr. Blake's intentions -- and, of course, his intentions must be attributed to his wholly owned subchapter S corporation -- may be found in the first "schedule" (set forth in our findings) that was prepared for the use of the vessel immediately upon taking possession. For the initial period of January 20, 1973, until after May 7, 1973, -- a period that largely extended through the sailing season in the Caribbean -- the projected use of the vessel was primarily for the enjoyment of Mr. Blake and members of his family. A comparable schedule was prepared for the following year. Indeed, during the first year, Whittemore and Williams was instructed not to accept any charters until *202 the summer of that year, notwithstanding that the yacht was listed as available for charter. And no charters whatever were entered into with anyone during the entire period of somewhat over two years that the corporation owned the boat, except for the one week charter to Mr. Gubelman during February of the second year. Although not of pivotal significance it is also worthy of some note that no brochure was prepared to promote charters of the vessel. Such a brochure, while not indispensable, was customarily used in connection with yachts that were seriously offered for charter. We did not find credible the proffered explanation for the absence of charters based on the lengthy periods of time that the vessel was undergoing repairs. In the first place, the boat was in sufficiently satisfactory condition for petitioner to make extensive use of it on a number of occasions for Caribbean cruises, sailing in New England, a trans-Atlantic crossing, participation in the Tall Ships Race from Copenhagen to Gdynia, and the trip to Dakar and up the Gambia River. But of even more telling significance, petitioner's intention in respect of the use of the America at the time of acquisition is *203 strikingly revealed in the foregoing schedule that was prepared in consultation with him setting forth in detail the plans for use of the vessel beginning immediately with the time that possession was transferred by the seller. That schedule contemplated extensive use of the America by Mr. Blake and his family from January 20, 1973, until after May 7 of that year, up to the end, if not beyond the end, of the season in southern waters. [5] The attempt to prove that petitioner had an intent to charter the boat to others and was prevented from so doing by reason of its unavailability for that purpose because of the need for extensive repairs and improvements is, in our judgment, specious. His true intent emerges from the "schedule" for use of the America before the need for any repairs or improvements became known. Furthermore, the record shows that a charter is generally entered into some weeks, and in some cases even months, prior to the actual start of the charter period. Yet the record fails to show that a contract had been entered into for even a single charter that had to be aborted or interrupted by the unanticipated repairs and improvements. In truth, there was no *204 real intention to engage in a serious chartering business. It is plain to us that what we have here is at most a business facade. We are thoroughly satisfied on all the evidence that the acquisition and operation of the America was not a profit-oriented venture. The vessel was *205 acquired for the pleasure and gratification of Mr. Blake. He used it extensively, although the evidence shows that he did not always derive the pleasure that he had hoped for.At most, the possibility of obtaining charters was viewed by him merely as helping to defray in part the costs of operating the vessel and thereby reduce his own costs.The following colloquy from petitioner's trial testimony makes this abundantly clear: THE COURT:
[W]as it your thought that the
fruits of these charters or anticipated
charters would be used
by you pretty much to offset
your costs of enjoying the boat
in the remainder of the year?
THE WITNESS:
Yes. It would cut my costs
considerably. Yes.
THE COURT:
It would cut them or defray
them.
THE WITNESS:
It would certainly, because I
couldn't use the boat all the
time myself so I had to do something
to keep it going when I
wasn't using it. That was the
big point. I was going to get
my own boating at a considerably
lower cost because of the ease
of chartering it.
THE WITNESS:
What I expected was to greatly
reduce my own costs, there's
no question about that.
It is clear from the record as a whole *206 that S.P. Blake, Inc.'s ownership of the America was not an activity engaged in for profit. We so find as a fact. Petitioners are thus not entitled to deduct the losses incurred by S.P. Blake, Inc., in the operation of the America. 2. The "donation" of stock and "sale" of the America. Petitioner contends that he made an unrestricted and unconditional contribution of 35,000 shares of Friendly Ice Cream Corp. stock to the Fund, and that he is therefore entitled to a charitable contribution deduction based on the fair market value of the stock, subject to the percentage limitations of section 170(b)(1)(C). Although petitioner acknowledges that the transfer of the stock was structured with a view toward its tax consequences, he maintains that after the Fund received the stock, it had no legal obligation either to sell the stock or to use the sales proceeds to purchase the America, and that these subsequent steps should thus not affect the validity of the initial "gift" of the stock. The Government argues that petitioner's transfer of the stock to the Fund was not a bona fide charitable contribution because petitioner's dominant motive for the transfer was not *207 detached and disinterested generosity in respect of those shares, but rather the desire to dispose of the America at a valuation set by petitioner. The Government maintains that the substance of the transaction was a sale of the stock on petitioner's behalf at a large taxable capital gain and a charitable gift of the America to the Fund. [6] If its position as to the proper characterization of the transactions in question is accepted, the Government agrees that petitioner would be entitled to a charitable contribution deduction in the amount of the America's fair market value, which the Government contends was $ 246,000.
*208 In order to qualify as a charitable contribution deductible under section 170, petitioner's transfer of stock to the Fund must be shown to have been motivated by "detached and disinterested generosity", and not by the expectation of the receipt of substantial economic benefits from the recipient of the purported contribution. See Winters v. Commissioner, 468 F. 2d 778, 780-781 (2d Cir. 1972); Rusoff v. Commissioner, 65 T.C. 459, 469 (1975), affd. without published opinion 556 F. 2d 559 (2d Cir. 1977); Seed v. Commissioner, 57 T.C. 265, 275 (1971); DeJong v. Commissioner, 36 T.C. 896, 899 (1961), affd. 309 F. 2d 373, 379 (9th Cir. 1962). Here, we find that petitioner's purported gift of the stock was in fact made in expectation of receiving substantial economic benefits commensurate with the value of the stock transferred.Accordingly, petitioner is not entitled to a charitable contribution deduction with respect to his "gift" of the stock. We further find that the Fund was a mere conduit for petitioner's realization of the appreciation of his Friendly Ice Cream Corp. stock, and that petitioner *209 is therefore taxable on the gain from the sale of the stock. We agree with the Government that petitioner's "gift" of the stock to the Fund was not purely motivated by disinterested generosity with respect to the shares, but was merely a step taken in the expectation of receiving something in return, the Fund's "purchase" of the America at a price set by petitioner, a price calculated to correspond roughly to the fair market value of the stock. The true objective of these related transactions is evident from the following excerpts from petitioner's own testimony at trial: THE COURT: The dominant impulse for these transactions; that is, * * * the purported gift of the stock, and the later sale of the vessel, the dominant impulse was to dispose of the vessel, was it not? THE WITNESS: Yes. THE COURT: And unless you expected the Fund to use the proceeds of the sale of the stock to purchase the vessel, would you have ever given them the stock at all in the first place? Bearing in mind that the dominant purpose of this whole bundle of steps that were taken was to dispose of the vessel? THE WITNESS: I would have probably given them some money but not that much, because I had *210 given them money before. THE COURT: But the objective, the dominant objective, of the whole transaction, or the components of it, was to dispose of the vessel, was it not? THE WITNESS: Yes. MR. GAD: Mr. Blake, did you consider giving a donation of five or six hundred thousand dollars to King's Point, at that time, wholly apart from the boat? THE WITNESS: I had given them money before but I hadn't considered giving them that at this moment, except for the boat thing. * * * Not only did petitioner lack donative intent with respect to the stock when he made the "gift" to the Fund, but he also received substantial economic benefits in return for his purported gift. On the transfer of the America to the Fund petitioner [7] received $ 685,000 in cash, a price roughly equal to the fair market value of petitioner's Friendly Ice Cream Corp. stock on the date of its purported gift to the Fund. Furthermore, petitioner was relieved of the necessity of finding a buyer for the America. Petitioner supplied all the funds for S.P. Blake, Inc.'s operation and maintenance of the America , and maintenance costs on a vessel such as the America could be expected to be very *211 high. Since the market for the sale of such vessels was limited, petitioner might have had to hold the vessel for an extended period before a buyer could be found, [8] and thus would have been required to contribute more funds for the maintenance of the America. On the whole, we are not satisfied that petitioner did not expect to receive economic benefits commensurate with the value of the stock transferred to the Fund, with the consequence that petitioner has not carried his burden of proving that he is entitled to the claimed charitable contribution deduction with respect to his purported "gift" of stock to the Fund, except to the extent agreed to by the parties. [9]
*212 We further find that the Fund was a mere conduit for petitioner's sale of his appreciated stock, and that petitioner is thus taxable on the gain on the sale of the stock. The Federal tax consequences of the disposition of appreciated property must turn on the substance of the transaction, rather than its form. As the Supreme Court stated in Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945), "[a] sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title". Thus, in circumstances where the transferor has not effectively parted with control over the transferred appreciated property, the property's subsequent sale by the transferee may be treated for tax purposes as a sale by the transferor, and the gain realized on the sale will be taxed to the transferor.See, e.g., Griffiths v. Commissioner, 308 U.S. 355, 357-358 (1939); Hallowell v. Commissioner, 56 T.C. 600, 606-607 (1971); cf. Lustgarten v. Commissioner, 639 F. 2d 1208, 1210-1211 (5th Cir. 1981). Moreover, if a donor of appreciated property has, by actions taken prior *213 to or contemporaneous with the gift of the property, in substance restricted the donee's ability to deal with it so that the donee merely carries out a prearranged plan for the realization of the income from the donated property, the donor may be taxed on the appreciation. See Jones v. United States, 531 F. 2d 1343, 1346 (6th Cir. 1976); Kinsey v. Commissioner, 477 F.2d 1058, 1063 (2d Cir. 1973); Hudspeth v. United States, 471 F. 2d 275, 277-279 (8th Cir. 1972); Salvatore v. Commissioner, 434 F. 2d 600, 601 (2d Cir. 1970); Allen v. Commissioner, 66 T.C. 340, 347-348 (1976). However, it does not follow that every disposition of appreciated property, followed by its sale by the recipient, will result in recognition of gas to the transferor. See, e.g., Sheppard v. United States, 361 F. 2d 972, 980-982 (Ct. Cl. 1966); S.C. Johnson & Son, Inc. v. Commissioner, 63 T.C. 778, 788-790 (1975). As the Supreme Court stated in a similar context in United States v. Cumberland Public Service Co., 338 U.S. 451, 456 (1950), "[i]t is for the trial court, upon consideration *214 of an entire transaction, to determine the factual category in which a particular transaction belongs", and thus to determine which party in substance, as opposed to mere form, made the sale of apreciated property. See Hallowell v. Commissioner, supra, 56 T.C. at 607. In the context of purported gifts of appreciated property, it has been held that "[a] gift of appreciated property does not result in income to the donor so long as he gives the property away absolutely and parts with title thereto before the property gives to income by way of a sale". (Emphasis added.) Humacid Co. v. Commissioner, 42 T.C. 894, 913 (1964); accord Grove v. Commissioner, 49/ F. 2d 241, 246 (2d Cir. 1973); Carrington v. Commissioner, 476 F. 2d 708 (5th Cir. 1973); see Buehner v. Commissioner, 65 T.C. 723, 740-741 (1976); Palmer v. Commissioner, 62 T.C. 684, 693-695 (1974), affd. 523 F. 2d 1308 (8th Cir. 1975). Notwithstanding petitioner's attempt to show otherwise, we find that he has failed to establish that he parted with title to the stock absolutely, and did not make his "gift" to the *215 Fund conditional upon the Fund's use of the proceeds to purchase the America at an excessive price, thereby returning substantially all of the proceeds from the sale of the stock to petitioner. The inference to be drawn from the entire record is irresistible that the transfer of the stock was made with the understanding that the stock would be sold, that the yacht would be turned over to the Fund, and that virtually all the proceeds of the sale of the stock would end up in petitioner's hands. Because petitioner has failed to prove that his "gift" to the Fund was in fact unconditional, and since substantially all of the proceeds from the sale of the stock in fact were returned to petitioner following the sale, we conclude that the Fund was a mere conduit for petitioner's sale of the stock and that petitioner is taxable on the gain realized by the sale of the stock to the extent the amount he received exceeded his basis in the stock. In essence, petitioner simply made a charitable gift of the yacht and had his low basis Friendly stock sold on his behalf, receiving cash in the amount of its approximate value. The words of the Supreme Court in Griffiths (308 U.S. at 357), *216 although uttered in a somewhat different context, are peculiarly applicable here: "That was the crux of the business to [Blake] * * *, and that is the crux of the business to us". And, as pointed out by the Court of Appeals in Jones v. United States, supra, 531 F. 2d at 1345, "the 'realities and substance' of the events and not hypothetical possibilities should govern * * *". Petitioner's evidence as to the arrangements between himself and the Fund prior to his purported gift of the stock left much to be desired. Petitioner admitted that the dominant impulse for his purported gift of the stock was to dispose of the America. However, although he expected the Fund to use the proceeds from sale of the stock to purchase the America, he professed that he did not believe the Fund had a legal obligation to purchase the vessel, and that he had received no assurances from representatives of the Fund that the purchase of the America would follow the transfer of the stock. Moreover, the letters exchanged by petitioner and Mr. Mollard, president of the Fund, do not mention any restrictions on the Fund's use of the "gift" of the stock. Nonetheless, after *217 carefully considering the record as a whole, and evaluating petitioner's credibility on the stand, we are left with the firm conviction that the "paper" documentation of petitioner's "gift" to the Fund, and petitioner's testimony that he placed no restrictions on the Fund's use of the stock, simply do not reflect the realities of the situation. It is clear from the evidence that the Fund paid petitioner a price for the America which was substantially in excess of its fair market value, as will be discussed in further detail hereinafter. The Fund routinely acquired a significant number of yachts, and the yacht committee of the board of directors arranged for the sales of these yachts, as shown by the minutes of the Fund directors meetings. It is inconceivable that the directors of the Fund, or at least the members of the yacht committee, were not aware that the price paid petitioner for the America as grossly in excess of what the Fund could realize on its sale. The fact that the Fund paid petitioner a price as much in excess of the value of the America, and a price almost equivalent to the fair market value of the stock at the time of its transfer to the Fund, raises *218 serious questions as to whether petitioner's "gift" of the stock was conditioned on the return of substantially all of the proceeds from the sale of the stock to petitioner at the time of the Fund's acquisition of the America. Moreover, there is substantial evidence in the record indicating that the Fund's directors did not regard petitioner's transfer of stock to the Fund as an unconditional gift. Indeed, although the record does not affirmatively show that assurances were given to petitioner that the purchase of the America and a payment to petitioner would follow the transfer of stock to the Fund, [10] there would have been a basis for such assurances from actions taken by the directors at their March 13, 1975, meeting, just four days prior to petitioner's transfer of the stock on March 17. At that meeting, the directors heard a report from the yacht committee that "Mr. Blake was very receptive to donating * * * [the] AMERICA to the Kings Point Fund", and that further "negotiation packages" as to the acquisition of the America were to be discussed with Mr. Blake. At that time, the directors approved a motion authorizing the yacht committee to take "such steps *219 as necessary to acquire the * * * AMERICA subject to the consent of the Superintendent and legal counsel". Although the directors did not specifically approve the acquisition of the America by "purchase" at this meeting, this action by the Fund's directors would have provided reasonable certainty that the acquisition of the America would follow any gift of stock to the Fund, and could have been the basis for assurances by Fund representatives that the acquisition of the America, and payment of $ 685,000 to petitioner, would follow the transfer of stock to the Fund. Furthermore, in the minutes of the April 8, 1975, Fund directors meeting, after the transfer of the stock, the acquisition of the stock and the payment of funds to petitioner on the purchase of the America, are clearly linked as if part of one integrated transaction. At that meeting, after hearing the yacht committee report the receipt of the stock, its sale, and the plan to use most of the proceeds for the acquisition of the America, the directors approved a motion to "accept the generous donation of Mr. P. Blake to be used for the purchase of the Yacht AMERICA and her maintenance. (Emphasis added. *220 ) These minute references suggest an understanding by the directors that the use of the stock was restricted to acquisition and maintenance of the America as a result of an agreement with petitioner, and this understanding was confirmed by the credible testimony of board members who testified at trial. [11] In the circumstances, we are unpersuaded that petitioner's "gift" of stock to the Fund was unconditional, and that his "gift" of stock to the Fund was not in fact merely a transfer of stock to the Fund for its sale on his behalf. Counsel for petitioners have called our attention to a number of cases holding that subsequent sales or redemptions *221 of property unconditionally given to a charity do not result in income to the donor or call for denial of a charitable contribution deduction with respect to the gift. See, e.g., Grove v. Commissioner, supra, 490 F. 2d at 246-248; Carrington v. Commissioner, supra, 476 F. 2d at 708-709; Sheppard v. United States, supra, 361 F.2d at 980-982; Buehner v. Commissioner, supra, 65 T.C. at 740-741; S.C. Johnson & Son, Inc. v. Commissioner, supra, 63 T.C. at 785-786; Palmer v. Commissioner, supra, 62 T.C. at 693-695. However, these cases all relied on findings that the donor had unconditionally parted with control of the property upon its gift to the charity, leaving the charity free to hold or dispose of the property as it wished, and that the gifts occurred prior to the realization of any income from the property. See, e.g., Grove v. Commissioner, supra, 490 F. 2d at 246-247; Carrington v. Commissioner, supra, 476 F. 2d at 709; Sheppard v. United States, supra, 361 F. 2d at 980-981, n. 13; Buehner v. Commissioner, supra, 65 T.C. at 741; *222 S.C.Johnson & Son, Inc. v. Commissioner, supra, 63 T.C. at 788; Palmer v. Commissioner, supra, 62 T.C. at 695. Here, because petitioner clearly received consideration for his purported gift of the stock, and because of evidence -- circumstantial to a certain extent -- that the gift was in fact conditioned on the Fund's purchase of the America and payment of the price to petitioner, we have rejected petitioner's assertions that his gift of stock to the Fund was unconditional. If, by means of restrictions on a gift to a charitable donee, either explicitly formulated or implied or understood, the donor so restricts the discretion of the donee that all that remains to be done is to carry out the donor's prearranged plan for disposition of the stock, the donor has effectively realized the gain inherent in the appreciated property. See, e.g., Jones v. United States, supra, 531 F. 2d at 1345-1346; Kinsey v. Commissioner, supra, 477 F. 2d at 1062-1063. Since petitioner has not established to our satisfaction that he in fact made an unconditional gift to the Fund, the cases relied on by petitioner do *223 not bar taxation of his gain from the stock transfer. [12]
3. Valuation of the America. In the event that we find, as we have, that petitioner is taxable on the gain from the sale of his stock, the parties have agreed that he is entitled to a charitable contribution deduction for the fair market value of the America on the date of its transfer to the Fund. However, the parties are in disagreement as to the fair market value of the America. Although the America was originally built in 1967 at a cost of $ 1,000,000 its value had obviously dropped sharply by November 1972 when petitioner undertook to purchase it for his wholly owned corporation for $ 500,000. For purported sale to the Fund for $ 685,000 occurred on April 24, 1975. In less than two months thereafter the directors of the Fund were considering *224 the sale of the vessel to a possible purchaser.The sale was ultimately concluded on August 6, 1975, for a stated purchase price of $ 246,000. Although we have found that this price was substantially below the then fair market value of the vessel, the $ 685,000 figure relied upon by petitioners is inflated far beyond what the America could have brought in April 1975, after being exposed to the market a reasonable length of time. It must be remembered that there was a serious economic recession during the period 1974-1975, and we found credible Mr. Whittemore's testimony to the effect that the prices of yachts had fallen substantially during that period, particularly for a yacht of the America's size, and that it might take about a year after the recession for former prices to be restored. He estimated that the reduction in value during the recession would have been approximately 30 to 40 percent. In this respect we found his testimony far more convincing that that of Mr. Kershaw who gave his opinion that there would be no reduction in value for a yacht of the America's size. However, we reject Mr. Whittemore's valuation of $ 500,000 to $ 600,000 in subsequent testimony *225 elicited by petitioner's counsel, because he applied his 30 to 40 percent reduction to an unrealistic valuation of about $ 1,000.000. He justified that nonrecession $ 1,000,000 figure on the ground that he understood that the yacht was actually sold for that amount a year or so later. But the record does not show that it was sold a year or so later for any such figure, and the evidence in fact establishes that even some two years later, 1977, after the recession and in the course of a period of at least some inflationary pressures, the America was sold by the purchaser from the Fund for only $ 575,000 plus $ 50,000 on a "contingent charter". Nor do we give any serious consideration to the evidence of the only nibble that petitioner got in his attempt to sell the America on the open market. The evidence involved a telephone conversation with a stranger named Mr. St. John, whom petitioner had never met and about whom he appeared to know nothing, in which Mr. St. John indicated an interest to purchase the yacht for $ 675,000. He never came down to inspect the vessel, and that was all there was to the matter. It was on the basis of such "negotiations" with this phantom *226 purchaser that Mr. Blake fixed the price of $ 685,000 in his "sale" to the Fund, and furnished it with a sufficient number of shares of Friendly Ice Cream Corp. stock to produce the cash with which to "purchase" the America. Obviously, the price of the vessel was of no concern to the Fund; it plainly could have been any arbitrary figure provided only that Mr. Blake supplied the wherewithal to make payment. The determination of fair market value does not involve a precise science. Cf. Chesapeake & Ohio Ry. Co. v. Commissioner, 64 T.C. 352, 391, 392 (1975). We must make a practical judgment based upon all the evidence as to what a willing buyer would pay a willing seller at the time in question where both are informed as to all relevant facts.We have already found that the August 1975 sale for $ 246,000 was substantially below fair market value since the America had not been exposed to the market for an adequate period of time. A further matter to be considered is the yacht's book value (adjusted basis) which appears to have been $ 496,778. This figure, however, does not take into account the economic conditions existing in the spring and summer of 1975. *227 Upon a careful study of all the evidence, including improvements to the yacht, it is our best judgment that the fair market value of the America at the time of its disposition to the Fund was $ 375,000. We so find as a fact.
4. Additions to tax under section 6653(a), I.R.C. 1954. Petitioners had the burden of proving that the underpayments of tax for 1973, 1974, 1975, and 1976 [13] were not due to negligence or intentional disregard of rules and regulations. Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner have failed to establish the absence of negligence in the preparation of the returns for 1973, 1974, and 1976. However, we find that petitioners have carried their burden of proof with respect to 1975. Petitioners argue that they consulted with and relied on competent legal counsel and accountants, in determining the proper reporting of income and expenses incurred with respect to the America and reporting of the purported gift of stock and "sale" of the America. Reasonable reliance on the advice of competent *228 tax counsel fully informed as to the relevant facts has been held to be sufficient to avoid imposition of the addition to tax for negligence. See Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976); Woodbury v. Commissioner, 49 T.C. 180, 200 (1967).However, petitioners have failed to established a sufficient factual basis for their claim of reliance on counsel, at least as to 1973, 1974, and 1976 [14] in respect of the claimed losses growing out of the operation of the America. Mr. Blake is a highly intelligent person, and the evidence clearly establishes that he was made aware of the necessity of obtaining charters for at least 20 to 25 weeks a year which might *229 produce some profit if depreciation were not taken into account or if it were claimed only at an abnormally low rate. Yet, even apart from the matter of depreciation, this plans for use of the vessel for his own pleasure and that of his family over virtually the entire season in the southern waters strongly suggest that he did not seriously contemplate chartering the America for anything like the number of weeks that would be necessary to yield any kind of profit. We are thoroughly satisfied that a person of his intelligence and attention to detail was fully aware of the situation and that he simply ignored it in the course of his own use of the vessel. We are wholly unpersuaded by the various excuses given to justify the course of action that was followed, and in our judgment they were merely conjured up ex post facto in an effort to explain the absence of profits. In these circumstances, we do not find that petitioners have carried their burden of proof as to the additions to that for negligence for 1973, 1974, and 1976. [15] The Commissioner's determinations with respect to the additions to tax for those years are hereby sustained. *230 Petitioners' actions for 1975 stand on a different footing. Petitioners' 1975 return shows income from the operations of S.P. Blake, Inc., and the deficiency notice for 1975 made no adjustment with regard to petitioners' reporting of S.P. Blake, Inc.'s income for that year. In the circumstances, we conclude that they were not negligent as to the reporting of the results of the operations of S.P. Blake, Inc., in 1975. Moreover, although the Government has suggested in its reply brief that the valuation placed on the America in the reporting of its "sale" to the Fund demonstrates intentional disregard of rules and regulations, we do not agree that petitioners' reporting of the "gift" of stock to the Fund and the "sale" of the America was an act of negligence. The evidence shows that the transaction was structured in a manner suggested by competent counsel, and, although the matter is not agree from doubt, we do not find petitioner's reporting of this transaction to be negligent.See Industrial Valley Bank & Trust Co. v. Commissioner, supra, 66 T.C. at 283. We hold that the section 6653(a) addition to tax for 1975 was improper. Decisions will be *231 entered under Rule 155. Footnotes
1. Petitioners objected, on the grounds of hearsay, to 10 documents (out of a total of over 170) stipulated by the parties. However, we have not relied on any of such letters or documents in making our findings or reaching any of the conclusions in our opinion.↩
2. Although the stipulation of the parties herein seems to indicate that the charter extended to February 12, 1974, a copy of the Charter Agreement itself is made part of the stipulation, and it shows that the period of the charter was from noon February 4, 1974, to noon February 11, 1974.↩
3. Section 1.183-2(b), Income Tax Regs.↩, sets forth the following relevant factors to be considered in determining whether an activity is engaged in for profit, although no one factor is controlling: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved in the activity.
4. In an attempt to lend credence to the claim that a "profit possibility" existed, particularly in view of a probable audit of petitioner's returns, Mr. Whittemore later recommended that depreciation be taken at only one-third the normal rate, 5 per cent per year instead of 15 per cent per year. And even such "profit possibility" depended upon 20-25 weeks of charter. Petitioner adopted these recommendations, but, as will appear hereinafter, we do not believe that petitioner even intended to have the America↩ chartered for any such period. The "profit possibility" was merely arithmetic manipulation, unrelated to reality or Mr. Blake's true intention.
5. To be sure, Mr. Blake had stated that his use of the boat would be subject to any charters that might be obtained, but we take that statement with the proverbial grain of salt in the context of this case. Furthermore, we have troubling doubts--not satisfied by the record -- as to the comparative likelihood of obtaining charters for a boat of the size and type of the America↩ after the season in the southern waters when the boat was operated primarily for Mr. Blake's benefit. The record does show that the possibility of charters in the fall months is practically "dead." And, taking into account the turn around time between the usual two-week charters and the time required for normal repairs and maintenance, a chartering program of 20-25 weeks seems wholly unrealistic. We do not believe that there was any serious intention to enter into a series of charters aggregating any such period.
6. The America was actually owned by S.P. Blake, Inc. However, there is no dispute between the parties that petitioner would be entitled to a deductible charitable contribution in the amount of the value of the America, if it should be determined, consistent with the Government's position, that petitioner must be treated as having sold the stock and donated the America to the Fund. If petitioner is deemed to have given the yacht to the Fund, he also would necessarily be deemed to have first received the America as a distribution from S.P. Blake, Inc. Cf. Tollefsen v. Commissioner, 52 T.C. 671, 681 (1969), affd. 431 F. 2d 511 (2d Cir. 1980), certiorari denied 401 U.S. 908↩ (1971). However, neither the Government nor petitioner has asserted that such a distribution would have any tax effect on petitioner in the years in issue, and we accordingly express no opinion on the possible tax consequences of such a distribution.
7. Although S.P. Blake, Inc., owned the America, the Fund issued its check in payment for the yacht directly to petitioner. The typed endorsement on the back of the check indicates that it was deposited in the account of S.P. Blake, Inc., but petitioner subsequently acquired the proceeds and invested them in a mutual fund. Petitioner's acquisition of the proceeds from the sale of the America is consistent with treating petitioner as the owner of the yacht by means of a distribution from S.P. Blake, Inc. See note 6, supra↩. 8. Indeed, the record shows that his prior attempt to sell the yacht on the open market was wholly unsuccessful. The only response revealed by the evidence to that prior effort to sell the yacht consisted merely of an unproductive telephone conversation. See p. 55, supra↩.
9. See note 12, infra↩.
10. The person who conducted the negotiations for the Fund's acquisition of the yacht, Commodore Hinman, was unable to testify at the trial because of medical problems. ↩
11. n this respect we do not rely upon certain testimony explicitly establishing an oral understanding or agreement between Mr. Blake and the Fund which we struck as inadmissible hearsay. The understading by↩ the directors is itself persuasive independent evidence of the existence of restrictions limiting the use of the proceeds from the sale of the stock.
12. The parties have agreed that if petitioner is taxable on the gain from the sale of his shares of Friendly Ice Cream stock, then petitioner is entitled to a charitable contribution to the Fund of $ 16,688.79, the difference between the $ 701,688.79 net proceeds from the sale of the stock and $ 685,000 paid to petitioner on the transfer of the America↩.
13. Only Mr. Blake is a petitioner as to 1976, and there is obviously no burden of proof on Mrs. Blake in respect of that year.↩
14. Although the corporation disposed of the America in 1975 and received no income in 1976, it did incur expenses for professional fees, filing fees and service charges -- not shown to have been unrelated to prior operation of the America↩ or otherwise connected with a bona fide profit oriented venture. These expenses amounted to $ 1,940, and petitioner reported this sum on his return as his share of losses from electing small business corporations.
15. An additional factor supporting our conclusion with respect to 1976 is petitioner's filing of a joint return for that year. Petitioner and Setsu Blake were divorced in 1976, and were therefore not entitled to file a joint return for that year. Sections 1(a) and 143(a), I.R.C. 1954↩. Petitioner has not established that he disclosed his divorce to his return preparers for 1976, and thus cannot justifiably claim that his filing of a joint return was due to the advice of competent return preparers.